I'm Don Verrilli for Robert Oman, and may it please the Court. For efficiency's sake, Ms. Shapiro and I are planning to divide the common issues in the case. Of course, we're ready to answer any questions that the Court has. But Ms. Shapiro plans to focus on the issues around failure to charge and prove knowledge of benefit and on the conspiracy issues. I plan to focus on three points that I'd like to summarize first and then go into more detail on. The first is that the Section 1343 and 1348 convictions have to be reversed because the government's interest here is purely regulatory, not economic. And under Cleveland, the regulatory interest is not property for the fraud statutes. The second point is that the most straightforward way to deal with the Section 641 conversion issue is that it has to be reversed because the government failed to prove any interference, much less serious interference, which is required with CMS's use of the supposedly converted rate-setting information. And then third, whatever else is true, Mr. Olan and Mr. Huber are entitled to a new trial because the district court's refusal to sever the Visium charges against Mr. Blazak, the separate charges, produced an egregious misjoinder in violation of Rule 8b that cannot be harmless because the government exploited it to bolster the extremely suspect credibility of the one witness, Fogle, on whom its entire case against Olan and Huber rested. If I could turn first to the property issue, I think the core point with respect to the property issue is that there's no getting around the Supreme Court's decision in Cleveland here. The interest that the government asserts is an interest in the smooth functioning of the rate-setting CMS process. That is a hundred percent regulatory issue. They make no claim that there's any need to maintain confidentiality in order to preserve an economic interest of the government. It's a classic regulatory program exercising sovereign power. In Cleveland, it was the state's police power. Here, it's the federal government's commerce power to regulate rates in this area. You're saying it never had any economic value before the rates were finally set? The government, that's correct, Your Honor. It has to have economic value in the hands of the government. It had economic value to others, that's for sure. But that's precisely one of the arguments that the Supreme Court rejected in Cleveland, and it said twice at the beginning of its analysis and again at the end that the question is whether it had economic value in the hands of the government. The licenses in Cleveland clearly had economic value in the hands of the recipients of the licenses, but no economic value in the hands of the government. In fact, here I think it's a fortiori following from Cleveland, because in Cleveland, the state of Louisiana at least received a revenue stream from the licensees. What about those Fourth Circuit cases where, for example, they seem to be in a situation of bids on public contracts where, for example, you know a submarine contract is going to be awarded to Electric Boat in a week instead of Newport News? If you leaked that the week before, that certainly has economic value to hedge funds to trade in Electric Boat or Newport News stock. How is the situation different from that? It's different in a fundamental way. In that situation, the disclosure of the information deprives the government of money, because the point here is that the problem with that disclosure is then the bidders can adjust their bids and they won't bid as much money for the government contract as they otherwise would. The government makes less money. The statute says that it covers a scheme to defraud money or property, but here you don't have money, you don't have property, and so those are quite distinguishable. What you have and what the government is claiming is a loss of control in the confidential information, but if one looks at page 23 of the Cleveland decision, one will see that Louisiana made exactly the same argument. It said the kind of fraud at issue causes us to lose control over the regulatory process. Control was one of the words that the government argued in favor of Louisiana's position, and what the court said on page 23 is the intangible right of control is not a property right for purposes of these fraud statutes. It is the government's sovereign power. It's not a property right. I mean, I just think, as I said, no getting around what the Supreme Court held in Cleveland. You have to show to prove property. I don't think Carpenter, the government cites Carpenter, but that doesn't help them, because there's a categorical distinction between confidential business information and confidential government information of this kind. The whole point in Carpenter was that the confidential business information had economic value to the Wall Street Journal. When it was published in the Heard on the Street column, it allowed the journal to sell more newspapers, and that was an economic value. Confidentiality protected economic value. Here, confidentiality protects regulatory interests, and those are exactly the kinds of interests that are outside the scope of the fraud statutes. And then there's one last point, if I could then move to the conversion issue. The Supreme Court in Cleveland said that it wasn't just rejecting the regulatory argument because it doesn't line up with what anybody understands as property. It was because there would be a sweeping expansion of the scope of federal law in a manner that there's no indication that Congress intended. You have that sweeping expansion here, but it would be worse, because in addition to all the problems that were identified in Cleveland, you're creating a situation in which any unauthorized release of confidential government information, for example, by a whistleblower to a journalist, which is then published by the journalist, would create the risk of being a wire fraud. It's also a risk of conversion under their theory, too. But in addition to all of the unjustified notions of expansion that the Supreme Court identified in Cleveland, you've got that additional one here, which is a very considerable problem. Now, with respect to conversion, it seems to me we've identified four separate reasons why that conviction has to be reversed. The clearest and most straightforward one I submit is that the government didn't show interference with its regulatory interests. Now, they have to show serious interference. It's an element of the offense, but they didn't prove any interference. The disclosure of this information didn't have any effect on the rate-setting process, the 2012 Radiation Oncology Rule. Why are there so many rules to keep it private, to keep it confidential? Why do they take such great efforts to keep all this confidential? So they certainly have a regulatory interest in it being confidential, but that's not the test under Section 641. This is a statute that focuses on stealing, embezzling, purloining, or converting money or things of value. And what the government has to show to demonstrate that one of those things has occurred, here a conversion, is that it has to show serious interference that prevents it to use the thing of value in the way that it wants to use it. And there's no proof of that here. The Radiation Oncology Rule was issued on time in exactly the form that it was intended to issue. And I think it's important to take a half step back and just think about what exactly they say here is the thing of value. And it's that what we're talking about is a prediction or a rumor about what CMS is going to do with respect to this particular rate-setting function, this particular rate that they're going to set, a prediction that turned out to be wrong in material respects. In an atmosphere in which there's an intense interest by lots of people in the public on what's going to happen here. And there's a lot of discussion about it and other public commentary about it. And, of course, this is a rate that's going to be put in a Notice of Proposed Rulemaking, which will have the consequence of triggering lobbying about it. And it's not unlawful to lobby in advance of the Notice of Proposed Rulemaking either. And lobbying does occur in advance of the Notice of Proposed Rulemaking. The interest that they're claiming is that there's going to be more lobbying in advance of the issuance of the Notice of Proposed Rulemaking that will be more targeted. And I understand why they would want to avoid that. But it is not serious interference with the use of the information. There's zero proof here. And they don't actually try to argue that there's proof here. What they argue instead is that, hypothetically, they have a generalized interest in avoiding this kind of disruption. Well, I think that that can't possibly satisfy their need to prove the element of the crime in this case. So what their case really comes down to on conversion is this. And I think they actually say something like this, and I think it's page 91 or 92 of their brief, that they say that the serious interference is complete at the moment of disclosure, at the moment of disclosure that the serious interference has occurred as a matter of law, because at that point they can no longer dictate when the disclosure occurs. Now, a couple of things about that. I don't think anybody who's understanding the word conversion, what it means in common parlance, would think that's conversion. Second point is that if you look at the case, one looks at the cases that we've cited at pages 36 or 37 of our opening brief, May, Collins, Kuhn, and there are a couple of others. That's not the test. The test is whether it's an interference with control that prevents the owner from using it in the manner the owner wants to. And here they use that information to set the rate without any interference, the same rate they wanted to set otherwise on time, no interference. They want to set the timing of the debate, right? They want to set the timing of the lobbying and the timing of the discussion. And that's pretty important for an agency, isn't it? So I think we're not saying it doesn't matter. What we're saying is that it's not the crime of conversion when that information is disclosed. And I think it's important to understand the implications of that. Well, it might have a different value to the person who's doing the converting. It doesn't have to be the same value to converter and victim, does it? No, it does not. But what it does have to do is prevent the victim's use of the information for its intended purpose. And it doesn't do that here. The intended purpose of this information is to assist in the rate-setting function. Right, but this conversion requires them to sort of engage in a dialogue about rate-setting, at least potentially, sooner than they intended and to use their resources differently. At least one could imagine that scenario, right? One could imagine it. Zero proof of it here. Zero proof. And this is a criminal conviction, and this is an element of the offense, and there's zero proof. That's a hypothetical interest. But beyond that, Your Honor, I think it's important to consider the implications of that view of Section 641. And it's this. On that view, if the conversion is complete upon disclosure of unauthorized information, of confidential information, unauthorized disclosure of confidential information, then every single time a federal government employee discloses confidential information in an unauthorized manner, it's a crime. Every single time, by definition on their theory, as I said, it's complete at the time of disclosure. So every time a whistleblower contacts a journalist or a whistleblower within an agency contacts a member of Congress about something that the whistleblower thinks is going wrong, that's a crime. And, you know, those of us who serve in the government know how much information in the government is labeled confidential, and every disclosure is a crime under their theory. So it's just unimaginable that Congress intended such an extraordinary sweep in this statute, not to mention the fact that it would wreak havoc. For example, every disclosure of classified information would be a crime of conversion under this statute for sure. But there's already a finely reticulated scheme of federal criminal statutes that provide the classified information as a crime was disclosed in some circumstances. But there isn't a general criminal prohibition against the disclosure of classified information. And that whole system would be thrown completely out of whack, because every one of those disclosures would then be a 641 violation. And it just cannot be that the Congress intended that the statute to have, that the statute to be interpreted in a manner that the unauthorized disclosure of confidential government information is a conversion snap like that, and that's not the case. I'm not terribly strict with the time, but I didn't imagine that we would expand the time here, and I think we will. But let's get to your third point. If I could just make my point of misjoint, I appreciate the Court's indulgence on that. So whatever else is true here, there was an egregious violation of Rule 8B by joining the Visium counts, which are counts only against Mr. Blazak, with the rest of this case, with the rest of the counts. Visium counts involved a different hedge fund trading a year after the conduct that was the basis of the allegations against Mr. Olan and Mr. Huber on different information from CMS in different stocks. There's only one point of commonality in that. Well, there was overlap in the time periods of the two schemes. The Visium scheme was 2011-2013. Deerfield was 2012-2014. Do you disagree with that? I don't disagree with the timing, but the only common participant in the scheme was Blazak. Well, but you mentioned that you said that they did not overlap in terms of time. That's why I raised that. That's not accurate, is it? Well, the trades that were the basis for the claim against Mr. — I think it's accurate in this sense, respectfully, Your Honor, in that the trades that were the first — The trades were later. The trades were in 2013 based on 2013 information, which is why I think there's no connection. But beyond that — Blazak was still the key player using his role as political intelligence consultant and his connections with CMS to milk his research sources, according to the government's brief. So there was considerable overlap in what was going on with the information, right? Respectfully, no, Your Honor. The only point of overlap is Blazak himself. It was different information with respect to the Deerfield trades and the Visium trades. It was a different — it was 2012 radiation oncology in the Deerfield trades. It was 2013 home health in the Visium trades. Visium is a different hedge fund than Deerfield. There's no evidence that the people in Deerfield talked to the people at Visium. The district court specifically found there was no common scheme. Well, the district court actually suggested that those counts that you're saying should have been severed could have been charged in the main conspiracy as part of a stubborn — let's get this wrong — spoke public and spoke conspiracy, right? I mean, that was the district court's conclusion. Actually, Your Honor, I think that's quite illuminating. The district judge said — he refused to sever on that ground at the beginning so they might be able to be connected up. But then by the end of the trial, he held that the government had failed to establish that. And when we asked for a mistrial or a limiting instruction, he said, well, there was no common scheme, there was no hub-and-spoke conspiracy. They failed to connect it up. But I'm not going to give you the limiting instruction anyway. And, you know, the government might, if there had been a limiting instruction, which, you know, at the beginning of the case, the government said there could be a limiting instruction, and it changed its mind by the end of the trial. And maybe if there had been a limiting instruction, the government could argue here that whatever prejudice arose from the misjoinder was dissipated by instruction. But we have found no case in this court or any other where, in the absence of a limiting instruction, the use of evidence in a misjoinder situation like this one has been upheld as harmless error. And the burden is, of course, on the government on that. And if I could — I will wrap up. But if I could just make one point, which I think is critical to understand why this can't be harmless error, is that the government's case, the whole scienter part of the case, depended on the credibility of one witness. This is a one-witness case, and that witness is Fogle, the Deerfield employee. And his credibility was incredibly suspect. He had been lying to the government for months and months and months, right up to the time of trial. He had all kinds of other problems, facing very serious jail time. His credibility was their whole case, and it was extremely suspect. And what's critical is to look at the way the government used the Visium evidence in its closing argument. And this is seen most vividly at page 1032 of the joint appendix. What they did was use the Visium evidence to bolster Fogle's credibility. There was a person from Visium named Playford. He's the person who testified at the trial. What he testified to was that understanding that Blayzac's information was being received in an unlawful way. And the government said, not once, not twice, but four or five times in that closing argument, you know, they say Fogle's lying. You can believe Fogle. You know why you can believe Fogle? Because Playford said the same thing. Playford and Fogle don't know each other, but Playford said the same thing. Playford said the same thing happened over in this other hedge fund. So you can believe Fogle. It seems to me in that situation there is no way to conclude that that's harmless error. Oh, I mean, I think an argument could be made that some of that evidence would have still come in even if it had been separate, even if you'd had separate trials. At least some of it might have come in to establish the scheme, right? Not against Mr. Olan, Your Honor. It couldn't come in. The government argued three things, co-conspirator evidence. Well, no overarching conspiracy, so it couldn't have come in on that ground. 404B evidence, but that would be admissible only against Mr. Blazak because it would be Mr. Blazak's motive and opportunity. And then that they could argue that I suppose that it had some marginal relevance to some overall scheme, but there wasn't an overall scheme. That's what the district judge found at the end of the trial. There wasn't an overall scheme. And even if there were, the prejudice of introducing that evidence in the way that I just described was overwhelmingly strong and outweighed its marginal relevance. But the test is different here because we're talking about establishing harmless error. And so the burden is on the government to show harmless error beyond a reasonable doubt. It's not the typical, we're not arguing an evidentiary point here. There's misjoinder. That results in, and based on the misjoinder, the government's got to show harmlessness beyond a reasonable doubt. In the absence of a limiting instruction, saying that this evidence, this Playford evidence, could be used only for these other purposes, you can't possibly meet that test. Thank you. Okay. Thank you, Mr. Reumann. I'll hear from Ms. Shapiro. Think you can get it done in four minutes? May it please the Court. My name is Alexandra Shapiro and I represent Appellant Theodore Huber. Nearly 40 years ago in Dirks v. SEC, the Supreme Court held that TIPI trading is not fraudulent unless the tipper breached a fiduciary duty for personal benefit. The Court emphasized that this personal benefit requirement is essential as a limiting principle to guide investors and avoid chilling analysts from ferreting out information necessary to the efficient security markets. 10b-5's language is broader than the Title 18 fraud statute, and nothing in Dirks v. SEC's progeny suggests that fraud could possibly mean something different in other statutes. Yet after decades of itself agreeing and, indeed, arguing to the Supreme Court that the meaning of fraud is consistent across the federal code when it comes to insider trading, now the government seeks to imprison traders for, quote-unquote, fraud that the SEC could not sue them for. That argument by the government contravenes the controlling authorities and it would also defeat the policy rationale underlying... How do you get around Carpenter though? How do you get around Carpenter where the Supreme Court affirmed the mail and wire fraud convictions and deadlocked the insider trading? So Carpenter... How could that... So doesn't... That means the mail and wire fraud convictions under Title 18 are okay even when you don't have an insider trading situation. They didn't say you have to engraft upon wire and mail fraud in Title 18 the insider trading elements. Respectfully, Your Honor, no. So first of all... Why not? Two points. First of all, the reason the court deadlocked on 10b-5 and Carpenter had to do with whether... The question was whether any fraud was in connection with securities, and the Supreme Court took up that issue in O'Hagan and agreed that it was. That was the debate. That was the reason the court was deadlocked, and that was the reason there's a dispute between the dissent and the majority in O'Hagan. Secondly, Carpenter... We really don't know that in Carpenter because there weren't any other opinions, right? Well, it's clear from the briefing, the briefing in the case, that the issue was about a dispute about whether there was an in-connection, the fraud was in connection with the purchase or sale of securities, and the government's brief in the case argued that as to fraud, the element was the same for all statutes. Secondly, the Carpenter opinion itself fully supports our argument in a number of ways. The court makes clear that what is fraud is when a person acquires information through a fiduciary relationship and is not free to exploit that information for his own personal benefit. Those are the words in the case. The court cites several authorities, and all of them are completely consistent with the notion that the theft of information has to be for some kind of personal benefit or personal profit. There's a case called Grim v. Shine that the court cites, an old Supreme Court case interpreting a criminal embezzlement statute, which was about an employee stealing money from his employer. The court also cites New York State case law for the proposition that where an employee exploits information to his, or sorry, where an agent exploits the principal's information for his own personal profit, he has to account to the principal for the profit. The entire common law theory behind this doctrine that is set forth in the Carpenter case is the notion that you can't use your fiduciary's information to profit from it, even if there's no direct harm to the fiduciary. And the last authority the court cites is from the restatement of agency, which actually has a comment that the court cites on the use of confidential information, which uses two examples, one of which is an insider trading example, where confidential corporate information is used by someone to trade and profit. Most of the cases involve exactly that, somebody disclosing information for a benefit, usually a financial one. But I'm curious. So imagine a hypothetical where you've got two hedge funds who have an idea about how to get their edge. The Droney hedge fund targets greedy individuals, people who are willing to disclose nonpublic information of the corporation for money. The Kearse hedge fund goes after disgruntled employees, those who feel they've been passed over or treated poorly and who might be willing to disclose information because they're pissed off at their employer. Your view is that the Droney group is engaged in securities fraud, but the Kearse group is not. Not necessarily, Your Honor. And just, if I could make one thing clear, I'm not re-arguing the Salmon case. So my point is that Carpenter focuses on these particular scenarios where people are making money, but personal benefit is obviously broader than that. So you think that the Kearse group is, that the tippers in the Kearse group, the disgruntled folks, are getting a personal benefit because spite can be so beneficial? I would need to know more, but no, I think probably not. And, indeed, that's actually not that far off from the actual facts of the Dirks case. Because in the Dirks case, the initial tipper was a fired employee of this corporation, and he gave the information to the fellow Dirks, fully intending that Dirks would share it with his clients and they would profit from it. And, indeed, they did, and they made, you know, something like $17 million. And so, yet, the court said that Dirks and the initial tipper, the tippers were not violating the securities laws and not committing fraud, precisely because the disclosure was not for a personal benefit. And the court said, as the court said in Dirks, this is an essential limiting principle. The Salmon court picked up on that as well. The Salmon holds that the disclosure of confidential information is not enough and that Dirks created a simple and clear guiding principle for determining tippy liability, which is the personal benefit test. And the government's theory would turn that on its head by simply enabling the government to use these other statutes to prosecute people who are not violating the securities fraud statute. Is anything in the text of these statutes that suggests this additional element? I mean, insider trading law is typically sort of judge-made law that's evolved over time. That's what makes it so fun for professors but so maddening for everybody else. But the mail-on-wire fraud statute had been around longer than Dirks. Is there anything in the text that suggests that there's this additional element? Well, Your Honor, if I may, I would actually turn your question the other way, which is to say there's nothing in the text that would otherwise indicate that it would be a crime for a remote tippy to trade on information from a consultant who has information that may come from the government. There's nothing in the statute that would possibly indicate indeed that. You want an additional element, the jury to be instructed on an additional element, right? No, Your Honor. The element is the scheme to defraud. And the question is, how is the scheme to defraud defined? And it's well settled that district courts are required to provide particular guidance on what is the scheme to defraud in different contexts. So in insider trading, it's been settled for 40 years that whether it's mail-on-wire fraud or 10B, that you have to have these elements to prosecute a remote tippy. The government never challenged that until around the time of this case. Indeed, not only did the government never challenge it, when they used mail-on-wire fraud with securities fraud in the 80s and early 90s, these elements were part of the instructions. They did it even after Newman in the Stewart case and the Walters case. They argued to the Supreme Court that the elements are the same, whether you're using mail-on-wire fraud or 10B, the elements of fraud. What is fraud? So this is just – it's not an extra element. It's just like in an honest services case, you have to explain to the jury that there has to be a bribe, for example. That's just – we have a couple of other examples in our brief of other types of fraud where it's well settled that courts have to provide additional guidance, and that's what we're talking about here. I do want to pick up – I see I don't have much time left for my second point, but I do want to just – Oh, you're five minutes over. You have no time. Fair enough. You're living on our goodwill. I appreciate the court's indulgence. Obviously, the brief suggested that we might go over on some of these things, and unless my colleagues are elbowing me in the ribs, I'll probably let you go a little longer. I appreciate that, Your Honor. So just one last point on this, just completing my answer to Judge Droney's question earlier about Carpenter. In O'Hagan, the court specifically held that the 10B-5 fraud in this context is of the same species as the mail-and-wire fraud in Carpenter and, again, talked about it in terms of personal profits to the traders. You're asking about 1348, then, since you're talking about legislative intent? Sure. In the 1348, the Sarbanes-Oxley Act changes in the creation of 1348. There's no discussion about this in that legislative history. That legislative history says we were trying to broaden the powers of prosecutors to prosecute security fraud cases, so we're taking out the purchase-and-sale requirement. Is there anything in that legislative history that suggests that you're right about the Dirks components being elements of these two statutes? I would actually respond in the following way. I think the legislative history strongly supports that the purpose of the statute was not to eliminate those elements in insider trading because the statute had nothing to do with changing any elements in insider trading. In fact, it's clear, as Your Honor pointed out, that the purpose of the statute was enacted in the wake of Enron was to make it easier to prosecute certain kinds of accounting fraud and other frauds without having to deal with the in connection with, and indeed the legislative history, and talks about the fact that at that time there was a case called SEC v. Zanford and the Court of Appeals had ruled that the purchase-and-sale requirement was very narrow and didn't cover the case. The Supreme Court later reversed that, but in the interim the statute was enacted precisely to deal with that problem, and also the legislative history talks about how in these kinds of complex accounting fraud cases they don't want prosecutors to have to worry about proving a mailing or a wire. The U.S. Attorney's Bulletin, which is cited, I believe, in Mr. Olan's briefs, as well as the amicus brief, one of the amicus briefs, also says nothing about, oh, you know, here you go, you have a statute that will help you prosecute insider trading cases. Quite to the contrary, it talks about the in connection with requirement, the mail and wire fraud requirement, the fact the penalty went up a little bit, and it also talks about allowing prosecutors to focus on the scheme to defraud rather than technical books and records or internal controls violation issues. So the statute had absolutely nothing to do with insider trading. Moreover, in terms of textual analysis, this statute is, if anything, a little narrower than 10b-5. I mean, these statutes are all very similar. The 10b-5 was based on mail and wire fraud, and 1348 was based on mail and wire fraud. And so they should all be interpreted consistently when it comes to this type of fraud. I know I'm way over, but I'd just like to spend a couple minutes on the Klein conspiracy, if Your Honor would indulge me, just very briefly. And I think this follows up a little bit on the discussion Mr. Varelli had with the panel regarding interference in the context of 641, but it's a little bit different. There was no agreement to impair, obstruct, or defeat the lawful functions of CMS. It is undisputed not only that CMS went about its business irrespective of the defendant's conduct, but nothing Deerfield did had or was intended to have any impact or much less negative impact on CMS's work. Obstructing CMS... Did you say they had to intend to interfere? Well, there has to be proof of an agreement, and the intent of the agreement is to impair, obstruct, or defeat the lawful functions of the agency. That's the government's burden. So I'm just pointing out that not only was there no such interference, CMS went about doing its job, nor is there any suggestion that it would have been part of the defendant's goals to obstruct CMS. If anything, that would have been contrary to their aims. It's obviously not illegal to obtain leaks about potential policy changes or to lobby in favor of them, and I think one thing that I do want to stress is that CMS is a different agency from some of the types of agencies involved in the cases in this area. So it's an inherently political agency, and the policies it's making are basically about how to divide out federal funds. It's not a law enforcement agency whose activities are going to be thwarted by the premature disclosure of investigatory information. It's not an agency like the FDA that has to make scientific decisions and that would be tainted by undue political influence. On the contrary, its mission cannot be performed without a dialogue with the public and many stakeholders, and the record is replete with numerous examples of that. They shouldn't have any control over when that dialogue takes place and how? Doesn't this scheme interfere with their ability to control the timing, at least of the discussion that you just described? Not at all, Your Honor. I think the evidence, if you actually look, the government is principally relying on this exchange with Niles Rosen, and if you actually read the email exchange between Rosen and Mr. Blazak, which is in Appendix 2431, you can see that, and that was their entire conversation, that Mr. Blazak starts out by saying that, of course, he's not asking for what Mr. Rosen's recommendation is going to be, and then he provides some information which Mr. Rosen testified was interesting and helpful, and that Mr. Rosen then passed on to CMS. Didn't Rosen say at the end, I'm not talking to you anymore, I'm worried about this? He didn't say he was worried about anything, nor did he say he was uncomfortable doing this. Did he say something like that? I'm sorry, Your Honor? Didn't he say something like, I'm uncomfortable talking about this information with you? No, he said that he agreed that as Mr. Blazak recognized that he couldn't share what his own recommendations would be, but he thanked him for the information, and then he forwarded it on to CMS. And so there's just – and I would add that if that type of an email were criminal, then there are numerous other criminals out there who talk to CMS on a regular basis and lobby CMS, and that would raise serious First Amendment concerns. It would raise serious concerns about democratic discourse along the lines that Chief Justice Roberts spoke about in the McDonnell case, and the Court has to interpret the statute more narrowly to avoid constitutional problems. One last point, if I may, Your Honor, just on that same vein. The Supreme Court about 100 years ago in the Gradwell case, which is cited in the papers, made clear that this statute, because of its potential breadth, must be interpreted in a way that the conduct it prohibits has to be plainly and unmistakably violate the statute. This Court has taken pains in its Klein Conspiracy jurisprudence to read the statute narrowly, to cover only because of that concern. The Copeland case talks about that, the In re Grand Jury proceeding case that we've cited. And the statute has usually been used to go after things like people bribing government officials to falsify reports, people interfering with IRS audits or creating mechanisms so people can make false statements in their tax returns and things of that nature, and nothing remotely like this that doesn't interfere with the agency. Thank you, Your Honor. Thank you. We'll now hear from Ms. Cassidy. Good morning, Your Honor. I represent Mr. Blasek, and I will focus on the insufficiency of the evidence at trial to prove the case even as charged. The government had to prove beyond a reasonable doubt for all the counts charged that Mr. Blasek received confidential information from an unauthorized CMS insider. The evidence failed to prove this with regard to any of the rules, and the government's case came down to he must have done it. The evidence showed that CMS is a government agency with a transparent process sharing information and goals with the public and healthcare industry. And I'd like to quote Mark Hartstein's testimony at 850, that CMS shared data in its public use files specifically to allow the public to, quote, have similar if not the same data that CMS uses in its rate-setting process so the public could replicate the changes to the rates that CMS is proposing. In other words, the public and the industry were supposed to be able to figure out where CMS was going and what was happening and have input into those. There was a lot of exchange back and forth. Blasek gave information to CMS. CMS people gave some information to him, but authorized information. Someone had to read this data that was all out there and published for the public. It was complicated. Somebody had to read and understand it. That was Mr. Blasek. He'd worked at CMS and understood the data and information that it used, and like many healthcare consultants, he tried to predict for his clients regulatory changes. His predictions were sometimes accurate and sometimes not. Critically, the evidence showed that on each rule, Blasek predicted correctly only the portion of the rule determined by published data or recommendations and that he was wrong about the other parts. On radiation oncology, there was no evidence that Worrell actually gave Blasek any information about it. The evidence established that Worrell really didn't know anything about the rule. He didn't work on the rule. He was on no e-mail list, no meetings about the rule. There was no evidence that he discussed it. Do I have to disbelieve Fogle, then, to agree with you? Fogle testified that he was given lots of information all the time that was confidential, right? He was, but his testimony was very general, that he received confidential information. When you looked at the actual e-mails. He testified that Blasek got them a lot of information. This is Schubert and Olin about CMS decisions that other DC analysts were not able to provide, and there was a lot of that. Then you attack Fogle and say he's a liar and he's got a bad background and everything. I mean, Fogle was a liar in addition to being coked out all the time throughout this whole process. He also was not in a position to know what was confidential. For example, he got it wrong. That's the thing. He says information was confidential and non-public, but Blasek didn't tell him that. Blasek only told him, I'm talking to people at CMS or I was at CMS. Nowhere in the record is there any admission in an e-mail or even made to Fogle that Blasek said the word non-public or confidential. All he talked about was it's from CMS. So it's Fogle's inference, Fogle's assumption that information was confidential, and he was wrong about that. We can see that he was wrong when he says that the ESRD prediction was based on inside confidential CMS data. In fact, that data was public. Bloom testified, only on cross-examination did all this come out, that that data was published all the way through the end of December 2012, which is what the rule was based on. It was posted on CMS's public website. So Fogle was wrong on that. Just like Samuels was wrong when he said we had confidential information. What was confidential? The kidney care slide presentation. No, it was not. That had been made public by Bloom on March 5th. So the witnesses' testimony that they got confidential... Why did Rosen cut off Blasek, then? Rosen didn't cut off Blasek. I mean, that's how the government wants to characterize it, but what actually happened... That was the last communication. Why would he say that? Because Blasek had already told him that, but he's just responding politely. Blasek had told him what? In his initial e-mail to Rosen, Blasek said, this is who I am, and I'm not asking you for your recommendations, but I'd like to give you some information about Myriad Genetics, which has 90% profit margins. Here's a study Deerfield has done. You should know this. You should consider this in your analysis. Rosen wrote back, thank you very much. I'm sending this on to Ann Housewald, I think it was, someone at CMS. And as you know, I cannot discuss my recommendations. But that's it. That was the whole exchange. Nobody thought there was anything wrong with this. Nobody until the government brought this case thought there was anything wrong with this. This was sent to Ann Housewald. Mark Hartstein testified that he understood that happened. He didn't see anything wrong with it. This was just a lobbying effort. There wasn't even a request for information. So that was really nothing. That was really, that claim about Niels Rosen was turned upside down from what the government thought it showed when the testimony came out. So I'd like to go through the rules. Radiation oncology. There was no evidence, as I said, that Wuerl knew anything about this. So the government's theory was that Wuerl must have tipped Blasek about the radiation oncology cuts because Blasek correctly predicted the precise cuts in treatment time of 30 minutes on each one, 60 to 30, 90 to 60. And Blasek met with Wuerl at CMS on May 8th, the day before he first predicted any radon cuts to Deerfield. But must have is not enough. The fact to be proven that Wuerl gave Blasek the time cuts must be logically based on the facts proven, his specific prediction, and the May 8th meeting. And neither fact can support that inference. On the specificity of the cuts, on the one hand, you have no evidence that Wuerl knew anything about that rule. On the other hand, you have the exact treatment time cuts were recommended by the major medical societies and their recommendations were published and circulated in the healthcare industry, including on radiology.org, available to all at least as early as mid-April, well before Blasek's prediction. CMS simply adopted those recommendations as stated. Why did they short all the stock then? Why did they short all the stock? Why did they make all this money? Well, first of all, they didn't make money on all these rules, but they made a little on this rule, not as much as they would have if Blasek had actually gotten the rule right. Why did they short? That's what they do. I mean, it's a hedge fund. They short stocks. They made $2 million on their shorts for that, for the radon rule, didn't they? But that wasn't as much as they could have made. I mean, they trade in large, they have a large volume hedge fund. So if they make $2 million, it's not a huge amount, but on any particular trade. The testimony was that they were a little disappointed on how much they made because actually, and this is crucial, Blasek got half the rule wrong, the part of the rule that wasn't based on published recommendations because aside from those public recommendations, he predicted that the cuts, those cuts which were published and recommended and was really a foregone conclusion that those particular cuts would be adopted because they were the medically necessary times, he predicted that they would apply to all sites. But CMS only applied the new rule to freestanding sites, not hospital-based sites, which were actually the majority of sites. Now, this wrinkle had major market significance for his clients. Fogle was particularly concerned to know this information and hounded him for maybe a month, it's on the record, to get back to him on whether this rule would apply to all sites. When Blasek finally did, he was dead wrong. No one gave him a copy of the rule they couldn't have. If he had the inside scoop, he would have known this. Now, on Blasek's meeting with Worrell, on May 8th, okay, we already know that Worrell knew nothing about the rule, nothing. There was no evidence anywhere that he knew anything about the rule that was involved in it at all. So, Blasek saw Worrell at CMS on May 8th, can prove nothing about what was discussed, let alone that he chipped in the rule that he didn't know anything about. And even if it had been proven that Worrell knew the specifics of the proposed rule, which it was not, proof that they met that day without more still ranks speculation what they talked about at all. They could have talked about baseball. They could have talked about nothing. Maybe Worrell just signed him in. There was a meeting at CMS that day where all of the high-level people, people who Blasek really wanted to talk to, policymakers, would have been. He would have met with countless other people, including Anne Hauswald, who was at the meeting. If he learned anything about the Radonc rule on May 8th and May 9th, because he was there both days, it was much less likely that he learned it from Worrell, who knew nothing about it than from any number of senior staff, like Hartstein and Hauswald, who worked on the rule, or non-CMS people like Dan Todd, who was in on everything. He was a Capitol Hill staffer. And any discussion, even of the most general kind, like CMS is really going to tackle treatment times this year, would have referred to the ACR recommendation. They were published, they were the guiding force behind this, behind this rule change. Now, ESRD. Okay, the first point on the ESRD counts is that the jury rejected the government's theory that Worrell tipped Blasek confidential information. It acquitted Worrell of all counts based on the ESRD rule. How the jury convicted Blasek of these counts is a mystery, because the government's only theory was that Worrell gave Blasek the confidential information. Again, the evidence showed that Blasek correctly predicted that part of the rule, determined by published data, and was wrong about the other parts. Congress had authorized a reduction in payments of up to 12%. CMS imposed a full reduction based on publicly available data that it collected on declining drug use. This data, and there's a lot of evidence, this data was available in CMS's own public use data bank, posted publicly all the way through the end of the year. That's at 494, that's Bloom. A GAO report, 490 to 96 in the appendix, CMS's public presentation to Kidney Care, and in a published study circulating on Capitol Hill. Blasek told Deerfield, this is at 580, that his prediction was based on this data. He told Fogle that. Fogle interpreted this as meaning confidential inside data, but those words weren't said. Even Fogle doesn't say that he said it was confidential. He assumed it was, but it was not. It had all been published. An email showed Blasek and Andy Statler, this is at 8, 3050, doing their homework, discussing the data and its justification for the maximum cuts. I mean, this is, I think, mostly in the brief, right, which we've read, but maybe hit the highlights, I think, is the key. My main point is that there was no direct evidence at all that any particular person gave any specific piece of confidential information to Mr. Blasek. It was all based on inferences from facts that could not prove those inferences. Because there was, on the one hand, published data that Blasek had every reason to know about and certainly did know about, and then there was very flimsy evidence, like that he met with someone, no evidence of what they discussed that day, to support the government's inference. And where the evidence is even equal, there is insufficient evidence to convict. Here it was not even equal. It was more likely, if you look at all the evidence, that Mr. Blasek's predictions came from the published data, and he put two and two together. He knew this little bit, this little bit. His job was to put it all together and make a prediction. Thank you. Thank you. We've got a minute for rebuttal. We'll now hear from Mr. Sullivan. From Mr. Worrell or Worrell, how do you pronounce it? It's Worrell, Your Honor. Worrell. My name is Daniel Sullivan for a colleague, Christopher Worrell. Your Honor, however you resolve the common legal issues that you were discussing earlier this morning, I'm here to discuss a separate challenge raised by my client that independently requires reversal of his conviction. The government had to establish two propositions in order to prove its case against Chris Worrell, that he knew what the 2012 radiation oncology cut was going to be, and that he tipped it. And we'll get into the details in a moment, but as to both, the evidence the government points to in the five pages of its brief on this, and it's 102 to 107 of the red brief, the evidence the government points to adds up at most to a resounding maybe. It's possible. But maybe and possibilities do not suffice to sustain a criminal conviction. Let me start with Worrell's knowledge, or rather lack thereof. The government has no plausible theory for how Worrell learned what the 2012 radiation oncology cut was in the first place. It had a theory at the beginning of the trial, but that theory, that Worrell learned about reimbursement rule changes from his work on the claims monitoring project, collapsed on cross-examination of the very first witness. So instead, on appeal, now the government argues that Worrell had access to the 2012 radiation oncology cut. What it really means is that Worrell knew people who knew, and that is not the same thing as knowing the information yourself, and it's particularly implausible in the context of the evidence as a whole, your honors, that Worrell actually knew about it. So consider what the government does not a dispute, and we laid some of this out on the first page of our reply brief. Worrell did not work on radiation oncology. He did not work on reimbursement rule changes, and Hartstein and Bassano emphatically testified that he did not work on this radiation oncology reimbursement rule change. Reimbursement rule changes, as John Blum testified, were kept within a clearance chain, and Worrell was not part of it. Those who did work... Worrell was the source of the confidential information. Sure, your honor. This is the government's main source theory. So a few points on that. First of all, that, of course, does not affect the first prong of the case the government needs to prove about Worrell's knowledge, right? But even taken on its own terms, main source is not a phrase that comes from the mouth of any witness about Worrell. It's the government's phrase. In fact, if you were to do a phrase search of the trial transcript, you will find the phrase main source appearing exactly once in connection with Chris Worrell, and that is in the government's summation. What Samuels said, or frankly both Ethel and Samuels, were only able to point to one example in which Worrell supposedly gave Blazak information, and that was in Samuels, and Samuels said that Blazak said that Worrell gave Blazak a PowerPoint presentation. This is the February 22nd slide deck. That information, your honor, was already public when Blazak had it because it was in the KCP presentation, which John Blum had made on March 5th, and John Blum was very, very clear. He testified multiple times that by presenting information at the KCP meeting, he was making it public. So he said, for example, at A493 of the appendix, was another way that CMS made this information public through meetings with industry representatives, like the KCP meeting you mentioned? Response, that was one forum, yes, or at page A499 of the appendix. Question, now you would consider a presentation like that essentially making this information public, wouldn't you? Response, yes, and moreover, Worrell knew this because he was at the presentation, as is clear at page 498 of the appendix. So I think it's very telling that the only example of information the government has any evidence that Blazak ever got from Worrell is information that was already public. And it's very important, as my colleagues on this side of the dais have already made clear, to recognize that this case is about the interaction between CMS and the political intelligence profession. And information sharing is going on all of the time. So for a political intelligence consultant to have sources or to talk to people to obtain information, there's nothing wrong with that. And that wasn't the theory of guilt if the government advanced. Their theory was narrower. It was about pre-decisional information. They make this very clear on page 8 of their opposition brief on appeal. And so what they need is an example of Worrell actually providing pre-decisional information, the content of proposed or final rules before their public release. They don't have a single example of that. And, you know, that's sort of on the Worrell side, if you like. But on the Blazak side as well, I think it's also important to recognize that Blazak had many sources of information, including legitimate sources. We have a lot of examples of that, which we cite in the blue brief. He talked to Bassano. He talked to Hartstein. He talked to Hauswald. He talked to Brock. All people, by the way, who, unlike Worrell, were in a position to know what the 2012 radiation oncology cut was. And moving to sort of part two of, or rather the second prong of what the government has to prove here, Blazak communicated with several of those people in the days leading up to the May 9th tip that the government wants to attribute to Worrell. And this is very, very telling. The government points to the May 8th lunch, which is the day before the May 9th tip, and says, well, gee, it must be Worrell. On May 7th, Worrell reached out to Hartstein. On May 7th, he told Dr. Rosen he had reached out to N. Hauswald. N. Hauswald was at the HCPCS meeting on May 8th that Blazak was at CMS to attend. He scheduled coffee with Brock on May 9th. And all afternoon on May 8th and all morning on May 9th, Blazak had an opportunity to do what multiple witnesses said was his MO, walk the halls, hope he ran into someone that he knew, try to get the scuttlebutt, et cetera. In that context, Your Honors, it is not even as plausible, it is less plausible, significantly less plausible that Blazak was the source of the information. And on the subject of the MO here, both Plaffert and Fogle testified that Blazak's MO was to get information, quote, directly from people who worked on the specific regulation at issue. Again, not Chris Worrell. And I think the last point that I'll mention, Your Honors, is if you follow the chain of communications after May 9th, because there were several phone calls between Blazak and the Deerfield traders which were memorialized in e-mails, May 18th, June 6th, June 11th, June 29th, there is no evidence at all of a contemporaneous meeting between Worrell and Blazak for any of the others, other than the May 9th one as to which there's the May 8th lunch. And those e-mails cover information, as the May 9th e-mail does, that the government accepts Worrell knew nothing about, like the Dr. Rosen lab testing project. And finally, several of the e-mails refer to sources that could not possibly be Worrell. They refer to the number two in payment at CMS. The June 29th e-mail says that Blazak had an attendee at a meeting between senior CMS staff and OMB. That cannot possibly be Worrell because he wasn't in the clearance chain. He didn't attend those kinds of meetings. So the government's own evidence establishes that if Worrell had a source, it was someone, some high-level source who was not Chris Worrell. And so, you know, I think that if you, when you scrutinize the records, I know you will, it's clear that the government's theory of Worrell's guilt is by far the least plausible of the alternatives. Thank you. All right. Thank you, Mr. Shulman. We reserved a minute for rebuttal, but we'll now hear from Eddie. Is any of you doing it all yourself? I am, Your Honor. So these guys are just for moral support. All right. You have 20 minutes. Thank you. May it please the Court, Sarah Eddie for the United States of America. Now, the evidence was certainly sufficient here to permit a rational juror to conclude there was misappropriation of highly confidential, market-moving reimbursement rate numbers for the purpose of trading in the market. And I'd like to begin with some of the sufficiency issues that have been raised and then move to the headier legal issues after that. I'll begin with Mr. Worrell as the source of the radiation oncology information from 2012. Now, wherever Mr. Worrell sat during this period, it was clear that he had access to folks who were briefed on the radiation oncology rule, the proposed rule. And that's, for example, Government Exhibit 1400. It's an October 2011 email from Blazak to his partner, Samuel, describing the access that Mr. Worrell had. Now, then I just want to just walk briefly through the chronology here. In late April of 2012, the HAPG group, which has held this information internally for some time without leaks, releases the briefing papers internally within CMS to over 100 people. The initial tip here is not, well, the information is within HAPG. It is after that, once it's been released in the briefing papers, it happens on May 8th, which is when Worrell meets with Blazak for lunch. The next morning is when Blazak is tipping Deerfield. Now, there are other meetings between Blazak or other evidence that Blazak and Worrell are communicating during this period before the rule is finally announced publicly. Although there's no sign-in to CMS on June 5th, Blazak expenses a lunch at CMS. And his partner, Mark Samuels, asks him that same day, how was Chris? Those are Government Exhibits 1655 and 1625. June 6th, Blazak is reporting to Deerfield that the cuts are planned for June 27th, but he expects them to be somewhat planned to be announced that day, but they're probably going to come out a little bit later, about a week later. June 21st, Deerfield pings Blazak to get a radiation oncology update. Blazak immediately arranges a lunch with Worrell at CMS. On June 22nd, Blazak signs in to CMS. It's not clear there was time to actually have a lunch with Worrell, but he had time to connect with him long enough to then hear the news that he immediately reports back to Deerfield, which is he checked in on radonc and no news yet. Samuels and Eppel, these are Blazak's former colleagues, both testified. That Worrell was the source that Blazak referred to most often from CMS, and I think it was Samuels who testified that's the only source that Blazak named. When Blazak learns that the SEC is investigating him, who does he tell Eppel he called at CMS? Worrell, to check and see if authorities were sniffing around. When he's confronted by agents, Worrell begins by lying about his relationship with Blazak. He says that they only discussed sports. It's only when he's confronted with the sign-in information from CMS that he acknowledges he spoke about the agency generally. And the significance of one of the significant points of this February 6, 2013 briefing deck, it's a briefing deck that was supposed to be for John Bloom. It was presented to John Bloom, and the evidence is very clear that Worrell is giving that to Blazak, who then gives it to Amgen. Part of the significance of this is Worrell has no compunction about leaking confidential documents from CMS to Blazak. That's another piece of evidence that supports the inference that Worrell is the source. The PowerPoint you're saying is confidential at that point or not? Yes. And John Bloom, I urge you to read his testimony on this, because defendants try to take each piece of the information that's in that deck and say, well, that could have come from some public source, that information could have been accessed elsewhere, or it was made public at some point. But John Bloom testified that he viewed that as highly confidential and that it gave a roadmap for how the agency was thinking about the proposed change in the rules. Worrell also, when he was confronted by agents, acknowledged that this was a highly confidential document that should not have been disclosed outside CMS. I'd like to touch briefly on the misjoinder issue next. This is a case that involved not just a common defendant between the two schemes, it's the same victim, the same species of information. There is commonality in information between the two schemes. The 2013 home health data, for example, those tips were given both to Fogel and to Blazak. So there's commonality there. And it is the same time frame. So there was no argument that this was an improper misjoinder. What about the absence of a limiting instruction on that? Well, I think that issue you only reach if you determine that there was, in fact, a misjoinder. And then the question is whether the misjoinder was harmless. We submit there's really no good argument that this was a misjoinder, but if you reach the harmless error question, I think Judge Kaplan's analysis of this was absolutely correct. There was no problem with admitting this evidence. It was powerful evidence against all the defendants in the Deerfield scheme. One of the defenses that they raised, a principal defense, was, well, the information from Blazak was all public. It was public information. It wasn't coming from inside CMS. And the Playford's testimony about the Vizium scheme was powerful evidence proving otherwise. Blazak had sources within CMS, and that's where it came from. So you wouldn't give a limiting instruction because the schemes overlapped? Right. And because the other instruction that you would give, is that what you did? That's exactly it, and that was Judge Kaplan's analysis. That's what he said on the record, too, right? He did. Now, next, I would like to address the property issue. Mr. Varelli has argued that Cleveland controls this case. And in their brief, the defendants also cited the Sephar case. Those cases have nothing to do with this one. Those cases involve, as yet, unexercised government authority to do something. Here, there is property that already exists, confidential, highly market-moving information. And it would be property in the hands of Blue Cross Blue Shield. It's property in the hands of CMS. And there was an argument that there's no potential for economic harm to CMS here, through the release of this information. Of course there is. CMS is an agency that is paying medical service providers, setting the rate for how the government is going to pay medical service providers, from government coffers. So if CMS can't do its job, which is to effectively promulgate rules through a fair process that has equal participation by all stakeholders, and it does not unnaturally disrupt the markets, then there is an economic impact when that information is stolen. What about Mr. Burley's argument that whistleblowers are going to be prosecuted by the government? Look, this is not a case in which that concern is raised, of course. There's no First Amendment claim that's raised by these defendants. They don't have a First Amendment interest here. This is not a case in which there is public dissemination of the information. And I think the court's discussion in the Jeter case makes this distinction well. Here the defendants, of course, are disclosing the information and using the information secretly to profit for private gain. If there were a public dissemination concern, right, then there might be some First Amendment issues that come into play. They're not in play here. Likewise, merely disclosing information, it's not clear that that necessarily is misappropriation, just the disclosure. Now, we think it's a serious interference to disclose, but there has to be a misuse, right? And it's not clear. The Dirks case, the Supreme Court observed that there was no misappropriation in that case. So it is a signal that, you know, facts that involve a whistleblower, it's not clear that the wire fraud statute would necessarily reach it. But that's not this case. It's really not this case. On the serious interference point, our argument is that serious interference is inherent in the disclosure for trading purposes of highly sensitive economic information going to the core of the agency's function. That's the argument. I believe it's supported by the cases. None of the cases that discuss confidential information under 641 discuss this serious interference element because it's inherent in the nature of the conversion. I mean, what's the proof of trial about serious interference? Well, there was, I mean, again, we think that we didn't have to prove more than that there was a misappropriation for trading purposes of confidential information going to the core of the agency's function. That was our position. We think that's still correct. We did, nonetheless, prove that there was interference with the agency's function in a broader sense, and that was corrupting the fair process that's used to get to these rules, the reimbursement rate rules. Now, it is true that we didn't prove that the entire system collapsed, but I will observe that Mr. Blum testified, for example, that in response to the 2012 leaks, they did tighten their controls. They did have to tighten the channels through which they discussed this information internally within the agency, and Blum and Hartsfield and Bassamo all testified that that was a harm in itself to the agency because it limited the amount of internal agency discussion you could have that would improve the rules. And I'd also point to Government Exhibit 1318, I believe it is, which is one in which Mr. Blum is talking about needing to tighten the flow of information. Now, personal benefit, I'd like to address that next. The instruction that Judge Kaplan gave for the wire fraud and the 1348 counts was that the jury must find, quote, a fraudulent appropriation to one's own use of the money or property entrusted to one's care by someone else. That's transcript 3969. In any other misappropriation case under the wire fraud statute, that instruction would suffice. There's really no debate about that. So if Worrell had given the information to Blazak to sell to someone instead of trade on the market, that instruction would suffice. So that's our point about the personal benefit element being engrafted improperly onto 1343. Now, of course, there's not a ton of daylight necessarily between personal use and personal benefit, but to the extent there is a difference, the Dirk's test for personal benefit should not be imported into 1343. And there are some reasons for that. I mean, I think the court was noting earlier, 1343 has a longer history. It was modeled on the mail fraud statute, which predates Section 10B by over 50 years. And 1348, in turn, is modeled on 1343 and 1341. There's a peculiar history to the Dirk's personal benefit notion as well. That arises from an agency rule, the Katie Roberts case, agency decision, interpreting an agency rule on the backdrop of Section 10B. And it's about a peculiar kind of duty, the duty that began as the duty of a corporate insider, the duty that that insider owes to the shareholder with whom he's transacting. And it's a duty not to gain personal advantage by using inside confidential information. That's where the personal benefit element arises from in Dirk's. Can I just make a point that the law professors raised about this overlap of Title 15, Title 18, insider trading, where they shouldn't graft the requirements of Newman onto the wire fraud and the securities fraud in Title 18. They say the government will rarely, if ever, have cause to charge an insider trading offense under Title 15 when it can prevail without proving the traditional insider trading elements by charging the identical conduct as wire fraud or under 18 U.S. Code Section 1348. What do you make of that? Are there going to be Title 15 insider trading cases brought by the government now, or are you just going to charge wire fraud and securities fraud under Title 18? No, I think we'll – I mean, I can't say for sure how we will prosecute these cases. I think we may make these determinations on an individual case-by-case basis. But, of course, we had long charged Kenby alongside 1343 back in the 80s and into the 90s. But more importantly, that is not a reason to construe 1343 any differently than it has been construed in the past, even if it has a broader scope in some ways. It has a – you know, if there's some conduct presumably it can't reach that's under Kenby. For example, Kenby has a different scienter requirement, as this Court acknowledged in the Litvak case, than under 1343. But the Botschelder principle, I think, applies here, which is that if there are overlapping statutes that cover the same conduct, the government can charge both, one or the other or both. I would also note that this issue came up in some variant in the O'Hagan case. There was discussion between Justice Thomas and Justice Ginsburg about the fact that the concern that the wire fraud statute or that the SEC might not be able to reach some conduct that the criminal statute could. Both sides agreed that was not a proper consideration in construing the statute at issue. Well, what's your view of Carpenter, then? Did it settle this issue that they can coexist, Title 15 and Title 18? I think it absolutely did. Well, how is Mr. Burleigh wrong about that? Or maybe it wasn't you. It was your colleague who said it. Well, I think Ms. Shapiro's point was that there's another element that's required under Section B, which is the connection with the securities. But I still think that Carpenter is very clear that this kind of conduct is prosecutable under the wire fraud statute, even if Section 10B doesn't reach it. And does Carpenter apply to the Title 18 securities fraud, too? That statute wasn't enacted at the time of Carpenter, but what's your view on whether that applies also to the new statute, the 2002 statute? I think it does apply to the 2002 statute. I thought that might be your answer, but why do you feel that? I think it is certainly true that 1348 was enacted against the backdrop of Enron and so on. But the language that's used in the statute itself, which is similar to the 1343 and 1341 and the bank fraud statutes and so on, it's broad. And the legislative history, I just want to focus on one snippet from that legislative history, which is this. Despite the best of intentions, federal laws may have helped create an environment in which greed was inflated and integrity devalued. Now, that doesn't capture just accounting fraud. It captures insider trading. It captures all sorts of fraud connected with securities. And we would submit that 1348, just like 1343, shouldn't have this extra element from Section 10B carried over into it. And I just want to make one more point. Ms. Shapiro has argued that the government for many years has been taking a position contrary to what it's taking now about personal benefit. And that is simply not true. The government's position historically and in Selman, in every case, has been, yes, personal benefit in the Dirk sense should be construed to mean the same thing as personal use in the misappropriation sense, when it's a misappropriation case. That has been the government's consistent position. Now, the courts haven't fully accepted that, but that's the government's position. And it hasn't been accepted in the 10B context. We acknowledge that. This court in Newman stated that the same test of personal benefit applies for misappropriation cases under 10B. But that's because of the peculiar history of the 10B jurisprudence. If the court will permit me, I would like to briefly address some of the knowledge issues that I expect my colleagues will raise when they stand up again. Because one of the big arguments that is made in the briefs is that Judge Kaplan did not instruct the jury on knowledge of the breach, with respect to either conversion or 1343. And I want to just point the court to two instructions. For the conversion instruction, the court required knowledge that the information was used in an unauthorized manner and in a way that seriously interfered with the government's right to use and control that property. That's transcript 3945. And then for the wire fraud and the 1348 instructions, the court instructed the defendant must have acted knowingly and willfully, with knowledge of the fraudulent scheme and with a specific intent to defraud, with defraud having just been defined to mean fraudulently misappropriating to one's own use confidential CMS information entrusted to one's care. And that's 3969. So the court did instruct that Huber and Olan, in particular, had to know about the breach in order to be convicted. And they did know. They did know. The relevance of these, part of the relevance of these Niles Rosen emails, is that it shows Blazak, Huber, and Olan, and Fogle all trying to get information out of Mr. Rosen. Sure, they might have been trying to lobby him, too, maybe, but the way they're discussing it amongst themselves is, oh, man, Rosen's going to shut him down 103 percent. It would be greater than bananas or whatever the term is, if we can get an input from Rosen. So they are trying to get this information, and they get shut down. They all know they're getting shut down because he is effectively a CMS employee, he's a CMS contractor for these purposes. So Huber and Olan are very well aware that CMS employees are not permitted to disclose this highly confidential information about reimbursement rates. Fogle's testimony, of course, also supports that. They also knew that the disclosures were deliberate rather than negligent or reckless in any way, and that's because of the repeated nature of the disclosures, and that, I think, is highlighted by the radiation oncology chronology that I went through earlier. Blazak is going in repeatedly to get follow-up information from Warren. Huber and Olan also knew that Blazak's sources were former colleagues and friends at CMS. They did know that about the sources, and they would know what he did for a living. So they would have anticipated the trading. The source would have anticipated the trading of the information. And I think the last topic I would like to hit briefly is the client conspiracy count, and this is the one that was addressed by Ms. Shapiro. I think that the Haas and the Peltz cases absolutely cover this situation, and the notion that the statute was vague in any sense as applied to these cases, simply can't be supported in light of that longstanding precedent. Now, Haas did involve in a couple of the counts bribery and falsification of documents, but as this court explained in Peltz later, it also involved counts that did not have those additional plus factors. It was simply conduct that was almost identical to the conduct here, which is the leaking of sensitive information from a government agency for the purpose of trading. And Peltz likewise involved a similar situation, leaking of government SEC information about a target of an investigation for the purpose of trading. And both of those cases, Peltz in particular, makes clear you don't have to prove that the defendant intended to stop the agency from taking the action that it was going to take. That is not the obstruction of lawful purpose that they're talking about here, or obstruction of government function. The obstruction of the government function is similar to what it is here, the misappropriation of confidential information, highly market-moving confidential information that goes to the core of the agency's function in promulgating rules in a way that doesn't disrupt the markets. If the Court doesn't have any further questions, then I will rest on my submission and ask that the judgment of the District Court be affirmed in all respects. Thank you. All right, we'll have a rebuttal. To give everybody a warning, I'm not going to be quite as profligate on the rebuttal, just because we do have other arguments today. Of course, Your Honor. Is that really? If I could, one point on each of the three issues. I spoke about it in my opening. On property, the government's made this argument, well, that the fact that the information exists means it's property. But under Cleveland, confidential or not, it has to have economic value. This Court said the same thing in Fountain. It said to establish property under the wire fraud and mail fraud statutes, monetary loss is the critical, indeed, perhaps threshold consideration, monetary loss. It said, though, it had to be to the government. I mean, there's no question this information had economic value. It certainly did to the government, to the hedge funds. But I thought you said it also has to have economic value to the government. That's correct. That's the precise holding of Cleveland, Your Honor, and it's exactly why in Fountain this Court said monetary loss to the government is the critical, indeed, perhaps threshold consideration in establishing property under these statutes. And there's a reason that this Court – Leaking bid information would never be actionable, then. It might be actionable under some other offense, but it is not a scheme to defraud the government of property. It can't be under the clear definition here. And I think there's a paragraph in Cleveland that's just critical. It says, tellingly, the government nowhere alleges that Cleveland defrauded the state of any money to which the state was entitled by law. If Cleveland defrauded the state of property, the nature of that property cannot be economic, and then, therefore, it cannot qualify as property under the statute. It's just right there, plain as day. In addition, the government wasn't able to offer any limiting principle here. They just said, well, it's not this case. But with respect to the First Amendment kinds of implications and, frankly, beyond that, just the huge sweeping expansion of scope of federal power, whether or not there's a First Amendment issue here, it could certainly exert a chilling effect, as well as having all the adverse consequences of a sweeping expansion identified in Cleveland. Now, with respect to the serious interference conversion point, the government's admitted that their test is that if confidential government information is disclosed, serious interference occurs at the moment of disclosure. But the test under the cases that we've cited in our brief, and I assume it has to be the test to avoid another gigantic sweeping expansion of federal law, it has to be serious interference with the thing of value that is allegedly converted. It has to be serious interference, in this case, with the prediction about CMS rate setting information. And that is not what they claim is serious value, is the value that's seriously interfered with. They claim a collateral effect on the regulatory process. It's not serious interference with the thing of value, and that's the crime under 641. Now, again, that collateral serious interference, which shouldn't count, we submit, is there's zero proof that there was any such interference here, rule issued on time and form they wanted, zero proof that it had any serious general interfering effects. It had this hypothetical effect that they identified, but it's just hypothetical. And then an aside, if I could, on knowledge on the 641 count the government raised, they also have to establish that Mr. Olan and Mr. Huber had knowledge that there was serious interference. Neither of them were employees of CMS. They had no reason to think they had any understanding of how CMS operated or how this could be an instance of serious interference. And so there's a failure proof on that as well. Now, with respect to Ms. Joinder, I've heard the discussion, but a couple of points, if I could. First, I'd urge the Court to go back to the text of Rule 8B. The text of Rule 8B says you can have a joinder if it's the same act or transaction or series of acts or transactions constituting an offense or series of offenses. It has to be the same act or transaction. It can't be some overlap. It has to be the same act or transaction. That's the text of the rule. And there's no argument here that this is the same act or transaction. And if one looks at the cases from this circuit that the government has cited, and Anastasia and the other ones, Anastasia was that the Court found a common scheme or single scheme of conspiracy, the very thing Judge Kaplan said didn't exist here. And in the other two, it was virtually the same as a common scheme because there were the same participants working two schemes designed to generate revenues to go into the same investment or the same fund. It was really the polar opposite. It was more to 8A than that, though, right? So yes, but the District Court said that the government failed to establish a common scheme or plan here. That's what Judge Kaplan found at the end of the evidence. He let this go forward without severing because he thought the government might prove a common scheme. And at the end of the case, when we move for a mistrial or for limiting instruction, he said, well, the government has failed to prove a common scheme. He found that. And so that's why the misjoinder is clear here. And then you get the prejudice, and then respectfully I would submit that Judge Droney, your dialogue with the government demonstrates why there was prejudice. It went right to Fogel and how important Fogel's testimony was on all of those issues that your questions identified. That's the whole point. So his credibility was extremely suspect and was bolstered with a Playford testimony, which came in without a limiting instruction because of this misjoinder. Thank you. Thank you, Mr. Verrilli. An item for Ms. Shapiro? For a minute or so. Very quickly, just a few points. First, with respect to the dialogue we've been having about the First Amendment, I want to be clear on two things. Number one, it's not just publication of information. We're talking also about just the constitutional principle of democratic discourse, as is discussed in McDonald. And the government talks about, oh, well, these defendants didn't have a First Amendment interest. In the Clark v. Martinez case, Supreme Court case cited in the briefs, the court holds that this is a constitutional avoidance canon of statutory construction and that the court has to adopt a construction to avoid the problem, whether or not these constitutional problems pertain to the particular defendant. It's a tool for choosing between competing interpretations, and the litigant is invoking his statutory rights. He doesn't have to be invoking his personal constitutional rights. Secondly, with respect to the personal benefit issue, I think the government actually effectively conceded the point in a way when Ms. Eddy invoked the Derps case and said that that whistleblower wouldn't have been violating the wire fraud statute and said that that reasoning applies to the wire fraud statute. Now, the government can't have it both ways in that regard, and I think it's very clear that 10b-5 is modeled on mail fraud, so the fact that mail fraud was enacted earlier is neither here nor there, and the O'Hagan discussion that my adversary referenced actually, I think, supports the point that the court was looking at mail fraud as similar to 10b-5, and this court's opinion in Chessman does the same thing. With respect to the instruction that Ms. Eddy talked about as it pertains to the Title 18 fraud counts, you'll search those instructions in vain to find anything specific regarding the knowledge of the remote tippees and what they had to know, and it's clear from the government's brief that their theory is that the remote tippees were aiders and abettors of a supposed conversion. The Rosemond case, which we cite in our papers, in the Rosemond case, the Supreme Court held that aiding and abetting requires actively participating in a criminal venture with full knowledge of the circumstances constituting the charged offense and full awareness of its scope. You will search the record in vain to find anything remotely approaching that evidence. Lastly, with respect to the conspiracy to defraud, if you look at Appendix 677, you'll see that Mr. Fogle basically admitted in his testimony that the purpose of that interaction was to influence Mr. Rosen, and if you read the email in its entirety, it's entirely consistent with that, and the Haas and Peltz cases both involve bribes. Peltz involved a bribe to a law enforcement agency to get premature disclosure of information about a pending lawsuit. Finally, I just urge the Court to keep in mind that if the government's position on the Title 18 is vindicated here, it can evade the requirements under the insider trading law, the securities laws, and it will be able to prosecute people for conduct that the SEC, which is the expert agency in this area, charged with protecting the integrity of the securities markets could not even sue. That would pervert both Congress's intent and policies and justice. Thank you.  Very quickly. The government's entire case on the Deerfield Count is dependent on proof that the information, that Blazek was unlawfully tipped by Worrell on both rules. It's clear now from its presentation here that the government's case for that fact has come down to the February 2, that it still claims is confidential. First, this slide deck had no information about the actual rule. Nothing had been determined. It was a very preliminary roadmap for a meeting to go forward on the rule. And John Bloom, and this is at Appendix 501, 504, said that although he considered the slide deck to be confidential, he acknowledged that every single thing in the slide deck was public. And if you read those pages, you see what it is. It's the statute, the regulations, last year's rule, the GAO report, public materials. So just putting together a bunch of statutes and regulations into a slide deck and putting a confidential label on it doesn't make it actually confidential. If Bloom had his way, every single thing uttered in CMS would have been confidential, but it wasn't really confidential because they were released. He released things himself. He released a more substantive slide deck on March 5 to the public, decided to release it, and released it. The truth is, what happened in this case, the government's whole case on the Deerfield Counts, it depended on its claim that Worrell was the tipper, and that, in turn, depended on these two slide decks. That all fell apart on their first witness on cross-examination of Bloom when he admitted that every single thing in both of those slide decks had been made public before Worrell ever gave them to Blasek. Now, just a quick point on the Visium Counts. No source was even identified for the supposed tips to Pleffert. There was no source at CMS even identified. It was some unidentified anonymous source. That cannot prove that the source was unauthorized, because it was testimony that high-level people were authorized to give information back and forth, and Bloom testified that he decided on his own to reveal a lot of information to the kidney care presentation, and there was no rule saying when he could do that and who else could do that. So we don't know who the source was. If it was somebody high-level, the head of a policy group, that could have been authorized. So those counts were really blatantly insufficient. Thank you. Finally, Mr. Sullivan. Thank you, Your Honor. I'll be very brief. The government started out by saying, I think, wherever Mr. Worrell sat, which I take to be a concession now that the evidence in fact shows that during the relevant period, Mr. Worrell did not sit in HAPG, did not sit in the Senate for Medicare leadership. On the knowledge point, which, again, there are two separate propositions the government has to establish, knowledge and tip. And on the knowledge point, I think the government is trying a new theory of knowledge at oral argument, but it's no more successful than any of the other ones. I think what counsel was saying is that HAPG was briefed on the radiation oncology rule in late April of 2012, and the rule is not released out of HAPG into the wider CMS world until May 8th, the day of the lunch. That's what I took the theory to be, but in any event, it is wrong. I would encourage you, first of all, to look at the Bassano testimony at pages 779 to 780 of the appendix. She makes very clear in looking at one of the government's exhibits, which is an HHS briefing paper. In other words, a briefing on the radiation oncology rule to the Department of Health and Human Services, not just outside of HAPG, but outside of CMS entirely, right? So the rule had been briefed to others beyond HAPG well before May 8th. Moreover, however, like every other briefing paper that mentions radiation oncology, like every other document in this case that mentions radiation oncology, Chris Worrell is not on that briefing paper. And that goes to the second problem with the government's new theory of knowledge, which is that there was no point at which the rule was released into the wider CMS world. As Blum testified, it was kept closely within what he called the clearance chain, and Worrell was not in the clearance chain. Just very quickly on a few other points the government made, they referred to Worrell signing Blazak into CMS on June 22nd. Counsel said, you know, there wasn't maybe enough time for lunch on that day. Here's the timeline on that day. At 1251 p.m., Worrell notes to Blazak he has a 1 p.m. call. 1251 p.m., notes to Blazak he has a 1 p.m. call in nine minutes. That's Defense Exhibit 27. 1254 p.m., Blazak calls Worrell's office phone. That's Government Exhibit 329. One minute later, 1255, Worrell signs in Blazak. That's Government Exhibit 1952A. 103 p.m., eight minutes later, Worrell dials into a conference call with Ackerman from his office phone for 24 minutes. That's Defense Exhibit 115 and Government Exhibit 329. Not enough time for a lunch. There's hardly enough time for a hello. And apparently the government's theory is that Worrell, having just signed Blazak into CMS, having just written his name on a sign-in sheet, then in the next eight minutes gave him non-public information. I think that's highly implausible. How many minutes do you think it would take to give non-public information? My point, Your Honor, is that Worrell has just signed, has just created a written record of the fact that he met with Blazak, and especially in light of the fact that there is no evidence that Worrell knew the radiation oncology information at all in this case. So he was apparently, according to the government's theory, Sure, right, right. But it goes to the implausibility, I think, that Worrell, having managed to avoid creating any record at all that he knew what the radiation oncology cut was going to be, then when he was about to give Blazak a tip, signed him into CMS, a point which I think also applies to the May 8th lunch itself. Very briefly, I know I'm out of time, Your Honor, and I appreciate the Court's indulgence. The government also referred as predicted to the Samuels and Eppel testimony. Again, neither was able to point to a single example of Worrell giving information to Blazak other than the February 22nd slide deck, which was entirely public. And on cross-examination, Tim Eppel admitted that he couldn't do that. And just to go back again to the slide deck, it's very important to distinguish between the two, if nothing else, for clarity. As counsel for Blazak said, the February 6th deck just reflected information that was in the public domain. But there's not even any evidence, there's no one who says that the February 6th deck came from Worrell. Samuel's testimony is limited to the February 22nd deck. That's the one, whatever you think about February 6th, and that was all public. But February 22nd is the deck that mirrors the KCP presentation. There's absolutely no dispute that when Blazak had the February 22nd deck on March 13th, the KCP presentation had already happened, that was on March 5th, and Blum said on cross, as I read earlier, that that made the information public. Thank you. Okay, thank you all. Obviously we went long, but it was useful to get that argument, so thanks. We'll reserve decision.